## GEORGE WIEST,

*vs.*

## RANDALL B. GARMAN, ALEXANDER McCONAUGHY AND JAMES B. RIGGS.

*Kent, March T., 1870.*

After the parties to a contract for the sale of lands have gone so far as to execute the contract by conveyance of title, the transfer of possession, and the payment or securing of the purchase money, the Court of Chancery will not unravel the transaction merely to relieve against the hardship, or even great injustice, of an unequal bargain. A contract executed will be set aside, only where either there has been mistake materially affecting the subject matter of it, and with respect to which the contract cannot be reformed, or where the contract has been procured by fraud, in some of its forms of misrepresentation, circumvention, or undue influence.

But misrepresentations made by the vendor to the purchases of a farm, at an exhorbitant price, as to the value of the crops produced and the cost of improvements made on it the preceding year, at the time of selling it to him, even if they form a material inducemement on the part of the purchaser to buy it, will not be ground for a decree rescinding the sale.

Two distinct classes of misrepresentations by vendors in a bargain are recognized with different effect. Against mis-statements which concern the essence or subject matter of the contract, equity will relieve, whether they be the result of fraud or mistake. But against such as concern merely the value of the property sold, equity will not relieve, so far as to rescind a sale already executed.

With reference to the effect of fraudulent misrepresentations by a vendor touching the property sold, there is a material distinction in a court of equity, whether the bill is for the specific performance of a contract yet unexecuted, or it is a bill to rescind a contract which has been executed. It is in this last class of cases that courts of equity so stringently apply the maxim *caveat emptor,* a hard, stern maxim, but one founded both on justice and policy.

Although for mere inadequacy of consideration, without other circumstances, a contract executed will not be rescinded, yet an unconscionable bargain made with a person of such weak understanding as to be incapable of self-protection, though not an idiot or lunatic, raises a presumption that it was procured through some fraud, or undue influence; and on this ground, equity will relieve such a person against a transaction which it would not, if it had been made with one of ordinary capacity. However, the court interferes in this class of cases with great caution, and only where the mental weakness to such a degree as disables the party for self-protection is clearly made out in the proof.

In all the cases in which the question of fraud, undue influence, or incapacity is raised, inadequacy of consideration is a material element; that is, by it proof on these points, which otherwise would be doubtful, may be rendered decisive. In a case where the capacity of a party to bargain is left in doubt, the very exorbitancy of the bargain may convince the court that the party must have been unfit to transact business, and have become the dupe of some imposition. But to have this effect, the inadequacy must be gross, and such as to shock the conscience and confound the judgment of any man of common sense. In all the cases in which inadequacy of price or value, has been treated as a material consideration, it has been of this gross character; and the inequality has not been less than half the value.

BILL IN EQUITY TO SET ASIDE A CONVEYANCE AND FOR AN INJUNCTION :—This was a bill for a decree to rescind the sale of a farm by the defendant Garman to the complainant, made in June, 1868, and executed by a deed dated August 7th, 1868. The consideration was $22,000, of which $1,000 was paid at the time of the bar-

gain, $7,000 more on the execution of the deed, and the residue of $14,000 secured by bond and mortgage, payable, .$4,000, April 1st, 1869; $1,000, January 1st, 1870, and $1,000 annually, thereafter, with interest,—with a clause making the whole debt payable upon default for sixty days in paying interest.

The bill charges fraud in procuring the sale, practiced by Garman, the vendor, and the other defendants, his agents, acting in concert. Sundry circumstances of suspicion are alleged, but the ground of relief chiefly relied on, is misrepresentation by Garman as to the amount and value of certain improvements he had put upon the farm, and as to the income derived from it in 1867. It is alleged that Garman represented his improvements as over $5,000, when, in fact, they did not amount to over half that sum; and his net income for 1876, he put at 4,000, whereas, he had not made $3,000. The bill also charges gross inadequacy in the value of the farm, it not being worth over $15,000:—also that the complainant was a stranger, a German, speaking English brokenly, inexperienced, wake-minded and credulous; and that he was imposed upon by the false statements of Garman, and by the fraudulent acts and practising of himself and his agent. The only other material allegation of the bill is, the omission in the deed of conveyance of a covenant of general warranty, and against incumbrances for which the contract of sale stippulated. Prayer for an injunction to restrain process taken for the collection of the mortgage, and for a rescision of the sale by a decree for a re-conveyance and for cancelling the bond and mortgage. There was no prayer for a decree that Garman execute a covenant of general warranty, &c.

The answers deny, generally, the equity of the bill. Garman's answer denies the complainant's alleged incapacity, and that the price of the farm is exorbitant. It admits that he represented that he had improved the

farm to the value of from $4,000 to $5,000, and alleges this to be true. As to the income for 1867 the answer states that he represented his gross produce at $4,000 in value, and alleges this to be true. It denies, generally, fraudulent acts and practices, and alleges that complainant bought upon his own judgment, formed upon personal and careful examination, after having visited other farms; that the price was his own offer made, and not accepted under several days.

The testimony on both sides was voluminous, going chiefly to the mental capacity of the complainant, the value of the farm, the improvements made upon it and the amount of income for 1867.

The bill was presented October 28th, 1869, and it was ordered that the application for injunction be heard December 1st, at which time the hearing was postponed to the 20th of the same month. On that day, after hearing argument by *Fulton*, for the complainant, and *Massey*, for the defendants, a preliminary injunction was ordered.

The cause came on for a final hearing on April 11th, 1870.

*Fulton*, for complainant.

1. The seller is held to a stricter rule as to representations than the buyer. 1 *Sugd. on Vend. Ch. I.Sec. III. Par.*, 39 *and* 58 ; *Mitchell vs. Zimmerman*, 4 *Tex.*, 75.

The income and value of improvements are material facts, and must have been truly represented. *Sugd. on Vend. Ch. I. Sec. III. Par.*, 57 ; *Irving vs. Thomas*, 18 *Me.*, 418.

2. The complainant is not affected by delay in seeking relief. In cases of fraud it is never too late. *White vs. Lightbourne*, 4 *Bro. P. C.*, 181 ; *Gould vs. Okedon*, 4 *Bro.*,

54

*P. C.*, 198 ; *Irwin vs. Kirkpatrick*, 3 *Eng. L. & Eq.*, 17 ; *Adams Eq.*,176 ; *Mitchell vs. Zimmerman, supra* ; *Hopkins vs. Beard*, 6 *Cal.*, 665 ; *Winslow vs. Bailey*, 16 *Me.*, 319 ; *Irving vs. Thomas*, 18 *Me.*, 418.

3. The rule *caveat emptor* does not apply in cases of fraud, which is an exception to every rule. *Sugd. on Vend. Ch. II, Sec. II, Par.*, 19 ; *Irving vs. Thomas, supra* ; *Crayton vs. Munger*, 9 *Tex.*, 285.

4. Mistakes, even innocently made, will be corrected in equity ; sometimes even mistakes of law, for example, as to the legal effect of a grant. *Green vs. Morris & Essex R. R. Co.*, 13 *N. J. Eq.*, 165, *Corse vs. Boyle*, 3 *Gr. Ch.*, 212 ; *Reynell vs. Sprye*, 3 *Eng. L. & Eq.*, 74. *S. C.* 11 *Bevan*, 618. Hence in this case, at least, the Court will reform the deed as to the omitted covenants.

5. A contract executed may be rescinded for fraud. There is no difference in cases of fraud between executory and executed contracts. *Adams Eq.*, 397 *and* 226 ; *Price vs. Price*, 12 *Eng. & Eq.*, 144 ; *Begre vs. Wentz*, 55 *Pa. St.*, 319 ; *Jackson vs. Summerville*, 1 *Harris*, 359 ; *Moreland vs. Atchinson*, 19 *Tex* , 303. It is true, as argued on the other side, that fraud must appear affirmatively, but no particular measure of proof is required. It need not be direct or conclusive, it may be circumstantial.

In questions of fraud, the price is material. Gross inadequacy is presumptive against the transaction, and calls for scrutiny, raises the question of fraud, and makes evidence of it significant. *Adams Eq.*, 79 *and note ; Hayes vs. Doane*, 11 *N. J. L.*, 84 ; *Stewart vs. Hubbard*, 3 *Jones Eq.*, 189 ; *Evarts vs. Evarts*, 55 *Pa. St.*, 110 ; *Brooke vs. Berry*, 2 *Gill*, 83 ; *Burte vs. Smith*, 15 *Tex.*, 219 ; *Argentei vs. San Francisco*, 6 *Cal.*, 677.

So, also, the condition and relative capacity of parties is to be considered upon the question of relief. If fraud

doubtful, even an unequal capacity is a ground of relief. *Green vs. Morris & Essex R. R. Co.*, 1 *Beas.*, 165 ; *Freeman vs. Griggins*, 2 *Jones Eq.*, 162 ; *Stewart vs. Hubbard*, 3 *Jones Eq.*, 186 ; *Praxton vs. Brown, Ib.* 494 ; *Bigler vs. Fleckenham*, 5 *P. F. Smith*, 279 ; *Kauffman vs. Swar*, 5 *Barr*, 230 ; 2 *Pars. on Cont.*, 774 ; *Moreland vs. Atchinson, Supra* ; *Ellis vs. Matthews*, 19 *Tex.*, 390 ; *Causey vs. Wiley*, 27 *Ga.*, 444 ; *Johnson vs. Chadwell*, 8 *Humph.*, 148 ; *Hyla vs. Mason*, 4 *Sneed*, 497 ; *Belden vs. Hennquiz*, 8 *Cal.*, 87 ; *Hunt vs. Moore*, 2 *Barr*, 105 ; *Hall vs. Perkins*, 3 *Wend.*, 626 ; *Brook vs. Berry*, 2 *Gill*, 83.

A party deceived may always avoid a contract procured by fraud. *Winans vs. Winans*,4 *C. E. Green*, 220; *Allaire vs. Whitney*, 1 *Hill*, 484 ; *Reynell vs. Sprye*,13 *E. L and E.*, 174 ; *Remson vs. Musgrave*, 2 *Mood. and Rob.*, 92 ; *Sugd. on Vend. Chap.*, 6 *Sec.* 1 *Par.* 28 ; *Livingston vs. Penn Iron Co.*, 2 *Paige*, 390 ; *Wiswal vs. Hall*, 3 *Paige*, 313 ; *Hewitt vs. Crane.*, 2 *Halst. Ch.*, 159 ; *Maedows vs. Smith*, 7 *Iredell Eq.*, 7 ; *Rosevelt vs. Fulton*, 2 *Cow.*, 129 ; *Turnbul vs. Gadsden*, 2 *Strobh. Eq.*, 14 ; *Pinckston vs. Brown*, 3 *Jones Eq.*, 494 ; *Hunt vs. Moore*, 2 *Barr*, 105 ; *Kaine vs. Weigley*, 10 *Harris* 179 *and* 183 ; *Jackson vs. Summerville*, 1 *Harris*. 359 ; *Mc. Conkey vs. Grubb, II Harris*, 321, *Cornelius vs. Molloy*, 7 *Barr.*, 293 ; *Hall vs. Perkins*, 3 *Wend.* 626 ; *Prentiss vs. Russ*, 16 *Me.*, 30 ; *Winston vs. Bailey*, 16 *Me.*, 319 ; *Joyce vs. Taylor*, 6 *G. & J.*, 54 ; *Davis vs. Calvert*, 5 *G. and J.* 269 ; *Hazzard vs. Irwin*, 18 *Pick.* 95 ; *Ingersoll vs. Barker*, 21 *Me.* 474 ; *Irving vs. Thomas*, 18 *Me.* 418.

6. Intention may be ascertained from the agreement in order to carry it into effect, even after deed passed. *N. J. Zinc Co. vs. Boston Franklinite Co.*, 2 *Mc. Carter*, 418 ; *Tyson vs. Passmore*, 2 *Barr.*, 122.

The proper remedy is rescission. In nearly all the cases cited this was the remedy applied.

*Sugd. on Vend. Ch.* 2, sec. 3, *Par.* 26; 2 *McCord's Chy.*, 159; *Coote vs. Coote*, 2 *Iredell's Eq.*, 159; *Stone vs. Dewey*, 4 *Metc.*, 151; *Freeman vs. Wiggins*, 2 *Jones Eq.*, 162; *Moreland vs. Atchison*, 19 *Tex.*, 303; *Mitchell vs. Zimmerman*, 4 *Tex.*, 75; *Albeny vs. Brannon*, 7 *Cal.*, 503.

*Massey*, for defendant.

The Court may rescind a contract executed for fraud, but fraud is not to be inferred from slight presumptions, but must be clearly and conclusively proved. A clear and well defined distinction as to relief, is also made between executed and executory contracts and to induce a court of equity to rescind the former, requires proof strong and conclusive.

What is fraud? There must have been misrepresentations, false to the knowledge of the party making them, relied on by the other party, forming a material inducement to the purchaser, and of which, by ordinary care and diligence, he would not have ascertained the falsity. *Adams Eq.*, (177); *Taylor vs. Fleet*, 4 *Barb.*, 95; *Smith vs. Richards*, 13 *Pet. S. C.*, 26; *Livingston vs. Penn. Iron Co.*, 2 *Paige*, 390; *Rupert vs. Dunn, Rich. (S. Car.)*, 104; *Sugd. on Vend. p.* 3–4; *Irving vs. Thomas*, 18 *Me.*, 418; *Dawes vs. King*, 1 *Str.*, 75; *Sandford vs. Rose*, 2 *Tyler*, 429; *Dunn vs. Chambers*, 4 *Barb.*, 376; *Tindale vs. Harkinson*, 19 *Ga.*, 448.

It will appear, from the cases cited, that relief has been granted to a vendor in three classes of cases.

1. Mistake on the part of both, or either, as to what was sold or bought. The rule stated generally is, that equity will relieve against mistake of both parties as to the substance of the thing conveyed, or fraud, or misrepresentation of one as to substance, but not for mis-

representation as to quality or value, except subject to the rule before stated from Adams.

In the cases of misrepresentation cited by complainant, either the vendee had no opportunity to examine, or the representations concerned a subject of peculiar skill and judgment.

2. When the parties were not on an equal footing as to information respecting the property, and the vendee had not opportunity to examine.

3. When one of the parties, by force of peculiar circumstances, is shewn to have relied on misrepresentations of the other, who sustains such a confidential relation to the vendee as to be able to exert an undue influence. When there is a legal capacity equity will not undertake to measure it.

Further, even when the relations are confidential, or where there is imbecility, also, it must appear that undue influence was, in fact, exercised. *Deaton vs. Monroe,* 4 *Jones Eq.,* 39 ; *Taylor vs. Taylor,* 6 *Ired. Eq.,* 26 ; *Rippy vs. Grant,* 4 *Ib,* 443 ; *Hunt vs. Hunt,* 2 *Beaslee,* 161 ; *Wendell vs. Rensellaer,* 1 *Johns. Ch.,* 350 ; *Russell vs. McNamara,* 14 *Ves.,* 91.

The inadequacy of price charged is not proved, but if it were, in no case is that alone, however gross, a ground of relief, except between persons standing in confidential relations. *Chesterfield vs. Janssen,* 2 *Ves. Sr.* 125 ; *Purcell vs. McNamara, supra* ; *Osgood vs. Franklin,* 2 *Johns., Ch.,* 23, *and cases there cited* ; *Seymour vs. Delancy,* 3 *Cow.,* 446 ; *Moth vs. Atwood,* 5 *Ves.,* 845 ; *Murray vs.* 2 *Sch. & Lef.,* 488.

The facts in this case do not bring it within any of the classes of cases in which equity has interfered, and fail to afford a ground for the relief sought.

## THE CHANCELLOR :—

It is a rule well settled, that after the parties to a contract for the sale of lands have gone so far as to execute the contract by the conveyance of title, the transfer of possession and the payment or securing of the purchase money, this Court will not unravel the transaction merely to relieve against the hardship, or, even great injustice, of an unequal bargain. A contract executed, will be set aside only where either, 1st, there has been a mistake materially affecting the subject-matter of it, and with respect to which the contract cannot be reformed ; or, 2d, where the contract has been procured by fraud in some of its forms of misrepresentation, circumvention, or undue influence.

The present case goes upon the ground of fraud. It is alleged that this was an exorbitant bargain, procured through fraudulent misrepresentations and arts, practiced by Garman and the other defendants in concert, upon a weak and credulous purchaser mentally incapable of protecting himself. Such is, in substance, the case made by the bill. This charge of fraud was, in the argument for complainant, sought to be maintained upon two general grounds. Each of them has received a distinct and careful consideration. The first of these grounds is the alleged gross and fraudulent misrepresentations by Garman, as to the value of the improvements made upon the farm, and the income· received from it for the year 1867. The allegation on this point is, that pending the negotiation, in June 1868, and while the farm was under examination by the complainant, Garman, as an inducment to the purchase, represented, 1st, that he had put upon the farm, improvements "to the amount and value of $5000 ;" and 2d, that " he had made $4000 off it the year before." The bill then denies that Garman had made improvements to more than one-half the amount of $5000. It also denies that he had made off the farm $4000, or even $3000.

The first step in the investigation of this charge should be to ascertain, precisely, what were the representations which, according to the record, Garman must be taken to have made. Let it be here observed that no person, other than the parties to this bill, viz: the complainant, Garman, McConaughey and Riggs, were present during the negotiation, in the course of which, the statements by Garman, as to improvements and income, are alleged to have been made ; nor is there proved any admission on the part of either of the defendants, as to what transpired during that interview. The whole transaction rests in the bosom of these parties, and we have, in the cause, no disclosure touching any representations made by Garman, except the allegations of the complainant in his bill, and Garman's counter-statement in his answer. McConaughey and Riggs, in their answers, are silent on this point. Garman's answer, not being made to interrogatories filed with the bill, is not, under the recently adopted rules of Court, evidence in his favor ; yet it may be used by the complainant against him as an admission in the cause, so far as it may go to support the complainant's allegation ; and it is only by using Garman's answer on this point, as an admission, that the complainant can draw from the record any proof whatever as to the representations made by Garman during the negotiation. It is hardly necessary to add, that Garman's statement, if used as an admission and is uncontradicted by evidence, must be accepted as it is made.

This result obliges the Court to one of two alternatives, that is, either to dismiss from consideration, as wholly unproved, the alleged false representations touching the improvements and income of the farm, or to consider this allegation of the bill upon the assumption that the representations made were such as Garman's answer states them to have been. This leads directly to what is the only admissible inquiry under this branch of the case, viz ;

how far the evidence, as to the value of the improvements and the amount of income, supports the representations which Garman admits that he made on these points.   And first, as to the improvements.   Garman admits his having stated to the complainant that improvements had been made " to the value of between $4000 and $5000."   To what extent, then, were improvements made in 1867 ? The testimony at large shows that fruit trees were set out, new fences set, and the old repaired, lime  extensively spread, and other fertilizers used ; that there was ditching and underdraining, a new carriage house and stable  built, the dwelling house repaired and the grounds improved.   The fact that these improvements were made is not  disputed. It is their amount and value that is in controversy, and about which we proceed to inquire.   Let us premise the inquiry by a very material and obvious consideration.   It is, that for the purposes of this cause, the amount and value of these improvements need not be so exactly ascertained, as would be necessary in an action to recover  their cost ; but rather, the question is, whether Garman's representa- tions were so wide of the truth as not to be accounted for by the usual disposition to over-estimate the value of one's own  property, especially the  value of  improvements attempted upon any considerable scale, a disposition stim- ulated, it may be, to some exaggeration by the  effort  to drive  a  good  bargain ;  in  other  words,  whether  there were over-statements so gross as to be attributable only to a fraudulent  design to cheat and over-reach.   I am  not able, upon the proof, to reach this conclusion.   After col- lating the testimony of all the witnesses as to the several items of  improvement, and calculating their cost, it  does appear that their total cost could not  have fallen much, if any, short of $4000.   If this be so, then  a statement by the vendor, made in driving a bargain, to the effect that he had improved to an amount of from $4000 to $5000, though somewhat exaggerated, cannot be treated as will- fully false and fraudulent, such as to lay a ground for rescinding the sale.

We next take up the other alleged fraudulent misrepresentation, the one touching the income for 1867. Garman admits that, pending the negotiation, he did say to the complainant that "during the preceding year (1867) he had produced from the farm crops, which, in the aggregate, had amounted to $4000." The difference, on this point between the bill and answer, is, doubtless, as to the sense in which the word "made" was used ; whether the statement that Garman had "made" $4000 off the farm," applied to the gross value of the produce, or to the net income of the business of the year. ·The latter construction, which is that given by the bill, is unsupported by any evidence. The only evidence adduced, Aaron Wiest's testimony, falls short of it. He says, "I heard Randall B. Garman tell my father, George Wiest, that he made $4000, off the farm in 1867." Four thousand dollars was the net value of the crops. I heard him tell my father so." The date of this conversation here becomes material. It is fixed by the cross-examination. "He told my father," says the witness, "the farm was very good and that he (Randall B. Garman) made $4000 from it in one year, viz : 1867, clear of all expenses." "This conversation," the witness proceeds to say, "occurred in 1868, in the month of August, in the afternoon." This, in the words of the witness, is the whole testimony as to what Garman said at any time on this subject. I am unable to accept it as proof of this allegation of the bill : First, because it does not go to the time of the negotiation, which was in June. The witness speaks of a conversation held in August, after the purchase had been made. Such representation then made, is not in accordance with the allegation, and what is of more consequence, it could not, under the rule of law, be material ; for a false representation, in order to be ground for rescinding a sale, must have been made before the sale, and have been an inducement to it. Nor, again, can the fact that such a representation was made in August, after the purchase, support an inference that a like statement had been

55

434     WIEST v. GARMAN, ET AL.

made previously, in June, pending the negotiation. It would be dangerous in the extreme to subject executed sales of real estate to the risk of being set aside upon inferential evidence so slender as this. Thus appears the insufficiency of this evidence, even supposing Aaron Wiest to have correctly understood Garman's meaning. But here arises a second observation to which this testimony is open, and that is, the inherent infirmity of testimony which does not concern some act or transaction, about which the witness could not be supposed to be mistaken, but which rests upon the witness' impressions as to the terms or purport of a conversation, a conversation held, as in this case, eighteen months ago, and on a point so liable to misconstruction as whether Garman, speaking of the productiveness of the farm, referred to its gross produce or its net income. Without questioning, in the least degree, Aaron Wiest's veracity, I should be unable, if the case depended upon it, to accept his impressions of that conversation, standing alone as his testimony does, as evidence of that clear and satisfactory nature which is necessary to warrant so serious an interference of the Court, as is the setting aside a contract deliberatly executed, such as this has been.

There remains then, to the complainant, as his only means of showing that any representations as to income were made, pending the negotiation, Garman's answer used as an admission. It goes to this extent, that he represented the value of the crops produced in this year 1867 at $4000. Then the only inquiry open to us is, how far does the evidence sustain this admission by Garman? Let us see. Dougherty, who measured and delivered the corn crop and took receipts for it, puts it at nearly 2200 bushels. He is corroborated by B. F. Hurlock, who helped get out the corn, also by J. A. Hurlock who bought part of it— 1700 bushels—at $1.00 per bushel. Crawford, the complainant's witness, estimates that there were 1800 bushels raised. The positive statement of the measurer must be

preferred to any estimate. This gives, at least, 2100 bushels, which, being sold at $1.00 per bushel, was worth $2,100. Dougherty also measured the other crops, the wheat crop at 550 to 560 bushels, say 550 bushels ; the oats at 250 bushels, and the potatoes at 260 bushels. The wheat was sold at $2.50 per bushel, the potatoes at 85 cents. What the oats sold for does not appear, but the market price at the time, Hurlock states, as 60 cents. Taking these quantities and prices, the gross value of the products of the year was $3,846.50, falling, it is true, a little short of $4,000 ; yet certainly not sufficiently so to stamp, as fraudulently false, a statement by Garman ·that the crops had amounted to $4,000. This is the extent of his admission in the answer, and nothing beyond this is proved. The conclusion to which this examination of the evidence leads is, that the alleged fraudulent misrepresentations touching improvements upon the farm and its income, are not proved.

But, again, even supposing that Garman's representations to the complainant, as to the improvements and income, were more in excess of the truth, and formed a material inducement to the purchase,. this would not be ground for a decree rescinding the sale. In the course of the decisions touching misrepresentations by vendors in a bargain, two distinct classes are recognized with different effect. First, are those which concern the essence or subject-matter of the contract ; as, for example, a representation that the property contains a valuable gold mine, when, in fact, there is none. Against a misstatement of this nature, whether it be the result of fraud, or only of mistake, equity will relieve ; and. this, because the purchaser does not get the thing which he contracted for ; of this class were the cases cited for the complainant from 2 *Paige's R.* 390 ; *Livingston vs. The Penn Iron Co.*, 3 *Paige's R.*, 313 ; *Wiswell vs. Hall, and Rosevelt vs. Fulton*, 5 *Johns. Ch. R.*, 174. 2 *Cow.*, 129. The other class of representations are those which concern, not the essence or subject

matter of the contract, but the value of the property sold ; such as the usual commendations made by the vendor, and rarely without exaggeration, touching the fertility, productiveness, improvements, income and general advantages of the property. Representations of this nature, a purchaser is not presumed to rely upon. If material at all, they should put him upon examination or inquiry; and the omission of a purchaser to exercise his own judgment in such matters upon examination or inquiry, or to seek disinterested advice, should his own experience or judgment not be reliable, equity will not relieve against ; that is, observe, not so far as to rescind a sale already executed. To this rule there are some exceptions. These are, where, under special circumstances, an examination of the property is very difficult, or the misstatement concerns a matter of peculiar skill and judgment on the part of the vendor, or there is an abuse of confidential relations between the parties dealing, or imposition upon a mental capacity too feeble to bargain. In these exceptional cases— and I have endeavored to comprehend all—equity excuses the purchaser's reliance upon the vendor, and his omission of the usual precautions for self protection; but otherwise, the maxim *caveat emptor* applies to all such representations by a vendor as relate to the value, quality and advantages of the thing sold. For illustrations of this rule, take a few of the adjudged cases in which relief has been refused. In *Fenton vs. Brown*, 14 *Ves. Jr.*, 144, a leasehold estate offered for sale was stated to be nearly equal to a freehold, being renewable upon a small fine. It turned out that the lease of the premises, being held of Magdalen College, Oxford, was renewable only at the discretion of the College, by which a large fine (£700.) was demanded. In *Scott vs. Hanson*, 1 *Sim.* 13, the land was described as "uncommonly rich water meadow land," whereas it was imperfectly watered. In *Taylor vs. Fleet* 4 *Barb., N. Y. Repts.*, 95, the misstatement charged in the bill was, that a farm on Long Island was full as early, if

not earlier, than any other land on the west end of Long
Island for raising market produce, which was the object
of the purchaser. It turned out that there was earlier land
on the Island.   There was some contrariety of evidence
as to what were precisely the vendor's statements, but
the Court held that, at all events, these were not such
representations as a purchaser should rely upon without
examination and inquiry, and that his disappointment was
not a sufficient ground to rescind the sale.   A case more
striking, and in its facts much like the present one, is
*Tindall vs. Harkinson*, 19 *Ga.*, 448.  The bill charged that
Tindall, desiring to invest in lands, and being inexperi-
enced, applied to Harkinson for truthful information as to
his lands, which Harkinson promised to give.    After
showing Tindall a portion of the lands, Harkinson assured
him that the rest was equally good ; that he had made 40
bales of cotton that year (1853) ; that the land yielded
800 to 1200 lbs. of cotton per acre, and 15 to 20 bushels of
corn ; that land in the neighborhood sold for $14 per
acre, the price he asked for his ; that it was a lively,
thrifty soil and well remunerative ; all which statements
Tindall confided in, and bought the land at $10 per acre.
The bill charged falsehood in all these statements.   The
case came up on a motion to dissolve an injunction after
answer filed, denying the charges of the bill ; but the
Court distinctly considered the sufficiency of the bill on
its face and expressed a strong opinion against it.

The cases cited for the complainant, such of them as
were accessible, have been examined.   They range them-
selves clearly within the exceptions before referred to, in
which the purchaser is excused from diligence.   In some
of them there were confidential relations between the
parties, as in *Pinkston vs. Brown*, 3. *Jones Eq.*, 449.  *Hunt
vs. Moore*, 2 *Barr*, 105.  In one, *Corneilius vs. Molloy*, 7 *Barr*,
293, the misstatement related to a matter depending upon
skilled judgment, and not discoverable by inspection, it
being a sale of composition metal represented to be cop-

per. Others, such as *Jackson vs. Summerville*, 1 *Harris*, 359, were cases of imposition upon extreme old age and imbecility, and in that case this was connected with gross inadequacy. The case most relied on for the complainant, *Irving vs. Thomas*, 18. *Me.*, 418. A lessee of a tavern took the lease at a high rent under a misrepresentation by the owner as to the profits of the business. He paid part of the year's rent, and being sued at law for the balance, defended upon the ground of fraud. The Court sustain the defense. They do so, however, with this express qualification, that the misrepresentation would not have been a sufficient ground to set aside the lease, so as to enable the lessee to recover back what he had paid, but that it served only as a defense against any further claim for rent.

It is very material to a right decision as to the effect of fraudulent misrepresentations by a vendor touching the property sold, whether lands or goods, to observe how the question comes before the Court, whether the fraud be used as a defense in a suit at law for the price, or as the ground of an action for deceit ; or, if in Equity, whether the bill is for the specific performance of a contract yet unexecuted, or as here, it is a bill to rescind a contract which has been executed. It is in this last class of cases that Equity so stringently applies the maxim *cavaet emptor* ; a hard, stern maxim, but one founded upon both justice and policy ; upon justice, because a purchaser, who is not within the exceptions before stated, may reasonably be required to exercise the ordinary means of self-protection before asking the aid of the law to undo his bargains ; and a maxim of sound policy, also, since without it, business dealings must become greatly unsettled.

To return to the case before the Court. The evidence upon the record, discloses nothing which can excuse a purchaser from forming his own judgment by personal

inspection as to the improvements which Garman had made, or by inquiry as to the productiveness of the farm. The means of doing so were accessible. No artifice to prevent examination or inquiry is in proof. To some extent, the subject was one upon which the vendor must be supposed to be more accurately informed than others could be, yet there was no question of peculiar skill or experience involved, such as any purchaser of ordinary intelligence could not, by reasonable care, judge of, so as to protect himself. Again, there were no confidential relations between these parties to warrant a reliance upon Garman's sole statement ; and finally, and what perhaps is the more material point in this cause, I am unable, as the sequel of this opinion will more fully show, to find, from the evidence, such a degree of mental incapacity on the part of the complainant, as to exempt him from the ordinary diligence required of purchasers who seek the aid of this Court to set aside their contracts.

We now come to the other general ground, upon which,in the argument,the charge of fraud in this contract was maintained. It was insisted that, although no direct acts of fraud, such as misrepresentation, circumvention, or imposition, might be disclosed in proof, nevertheless, the making of so unconscionable a bargain as this is alleged to be, with a weak and credulous purchaser, is of itself fraudulent, and a ground of relief in Equity. It is true that although, for mere inadequacy of consideration, without other circumstances, a contract executed will not be rescinded, yet an unconscionable bargain, made with a person of such weak understanding as to be incapable of self-protection, though not an idiot or a lunatic, raises a presumption that it was procured through some fraud or undue influence ; and on this ground, equity will relieve such a person against a transaction which would bind one of ordinary capacity,exempting him from the maxim *caveat emptor* before considered. It is, however, material to observe that the Court interferes in this class of cases with

great caution, and only where the mental weakness is to such a degree as disables the party for self-protection, is clearly made out in the proof.    This I gather as the result of the authorities.  It is unnecessary to review them. _Shelford, on Lunatics_, 1 _Law. Lib._, (267.)   1 _Fonblanque's Eq. B. I. Ch._ 2, _Sec._ 3, _n._ (2).   1 _Sto. Eq. Jur. Sec._, 235.  6 _Clarkson vs. Hanway_, 2  _P Wms._, 202.  _Bennett vs. Vade_, 2  _Atk._, 324.   _Gartside vs. Isherwood_, 1 _Bro. C. C._, 558. _Blackford vs. Christian_, 1  _Knapp_, 77, cited in 2 _Sto. Eq._, _sec._, 237.  Of this class are the cases cited for complainant from 4 _Sneed_, 498.  8 _Hump._, 145, 27 _Ga._, 444, and 19 _Tex._, 390.

Unquestionably, the bargain in this case is a hard and improvident one ; but is the complainant a person of such weak understanding as to bring him within the principle of these authorities ?   The opinions of the complainant's witnesses, who are numerous and respectable, do go to the extent of holding him wholly incompetent for any serious business transactions.   But the opinions of witnesses upon a question so uncertain as that of mental capacity, is not a safe, nor a sufficient ground for judicial action of so grave a nature as is here sought, unless these opinions be well supported by the facts entering into the history, acts and transactions, of the person whose capacity is in question. A degree of mental incapacity for business, such as should exempt one from the ordinary requirements of diligence and precaution, and justify the Court in undoing his transactions, must have shown marked results in his past business life.   Either the affairs of such a person will be found to have slipped out of his hands and have come under the management of others, or his own management, if allowed to continue, must have been attended with disaster beyond the making of one improvident bargain.   Again, such a degree of incompetency could hardly fail to have left traces of itself in his mode of dealing, in the particular transaction inquired of. Now, I am not able, by these tests, to find the complainant incom-

petent to the degree required. In the first place, the complainant, during more than half an ordinary lifetime, has been in active business, pursuing several avocations, farming, milling and merchandizing, in all which he has managed his own affairs ; and although, doubtless, not with as much wisdom or thrift as have many or most others in his sphere of life, yet without any marked failure or miscarriage, except that, as testified by one witness, he lost money at storekeeping, which a farmer, or miller, however competent for his own business, is very likely to do. And through all, he has reared a family, maintained a fair status in society, and, until this purchase, accomplished, if not any marked success, yet not a failure in business life. In the next place, looking to this purchase, and to the circumstances attending it, we do not observe, in his acts and mode of dealing, the marks we should expect to find of signal incapacity to bargain. In carrying out his purpose to buy lands in Delaware, he acted deliberately, made several visits, not less than three to Delaware, visited lands in both Kent and Sussex counties, examined three farms near Camden, and contracted for one on terms not so hard upon himself, but that the vendor, Mc-Bride, retracted. In the negotiation with Garman, even taking the statement of the bill, there was not betrayed undue haste, excitability or extreme credulity. He personally examined the farm, formed a judgment upon it, good or bad, and, as the circumstances of the case indicate, he made his offer, left, returned in a few days from below, found his offer accepted, and closed the bargain. In all this, there appears nothing but what ordinarily attends such transactions, even if we include no small anxiety, on the part of Garman, to sell, and of the land agents, to forward the sale. It is also a noticeable and significant fact, that throughout the complainant's efforts to buy land in Delaware, and especially during the two months which elapsed after the purchase from Garman, before it was completed, no interest, anxiety or interference appears on

56

the part of his friends to see that he might not be im-
posed upon.

But now we come to the unhappy feature of this case,
one which, more than all besides, has brought into ques-
tion the complainant's mental capacity.   That is, the
exorbitant price at which he bought.  It is evidently upon
the folly of this purchase that the witnesses have formed
their opinions.  The most emphatic among them—Delaware
witnesses—could have nothing else  to rest upon, for they
have known  him in no other transaction.   Their opinion
is based upon the assumption that the price  was about
double  the  value of the farm, their  average  estimate of
the farm being $12,000, against a  price amounting to
$22,000.

Now, it is certainly  true that, in all cases in which
the question of  fraud, undue influence,  or incapacity is
raised, inadequacy of consideration is a material element ;
that is, by it, proof on these points, which otherwise would
be doubtful, may be rendered decisive.   In a case where
the capacity of a party to bargain is left in doubt, the
very exorbitancy of the bargain may convince the Court
that the party must have been unfit to transact business,
and have become the dupe of some imposition.   But to
have this effect the inadequacy must be gross. 1 *Sto. Eq.*,
*Sec.* 246.  The bargain must be, as described by Lord
Hardwicke in *Chesterfield vs. Janssen*, 2 *Ves. Sr.*, 155 ;
"such as no man in his senses and not under delusion
"would make, on the one hand, and as no honest and fair
"minded man would accept, on the other ;" or, as Chan-
cellor Kent puts it, in *Osgood vs. Franklin*, 2 *Johns. Ch.
R.*, 23, "such as to shock the conscience and confound the
"judgment of any man of common sense."  In all the
cases in which inadequacy of price or value has been
treated. as a material consideration, it has been of this
gross character.  The inequality has not been less than
half the value, the English and American cases seeming

practically to apply what, in the civil law, was an artificial rule on this point. In the cases cited for the complainant, there was in none no less disparity than one-half the value, in many of them, much more. For example, in *Stewart vs. Hubbard,* 3 *Jones Eq.,* 186, sixty dollars was paid for a share in an unsettled estate, the share being worth $1200. In *Brooke vs. Berry,* 2 *Gill,* 84, three thousand seven hundred dollars was the consideration for land valued by the Court at six thousand five hundred and twenty dollars. In *Bruch vs. Smith,* 15 *Texas,* 219, two hundred and fifty dollars was the consideration for a widow's interest in an unsettled estate of her husband, worth eighteen hundred and seventy-three dollars and fifty-seven cents. Now to apply this test to the present case,—it is true that the complainant's witnesses estimate this farm at an average value of only $12,000, which is but little above half the price paid, $22,000. But their estimates manifestly do not include the improvements put upon the farm in 1867, at a cost, clearly proved, of hardly less than $4000. The witnesses, fourteen in number, being cross-examined as to these improvements, six profess to know nothing about them, and six more speak of them very partially and express themselves as unable to set a value upon them.

Two of them, Crawford and Ross, undertake to estimate the value of the improvements, but at a value much below their proved cost, not equal to half of it. It must be fair to assume that from 1866, when Garman bought at $11,000, to 1868, when he sold, the enhanced value of the property, in consequence of improvements, was at least equal to their cost, say $4000; and as upon the testimony of all the witnesses, prices of real estate had not begun to decline in the summer of 1868, it may be considered that in June, 1868, this farm had a market value of from $15,000 to $17,000; that is, estimated according to the prices and expectations which then prevailed, and not under the depression which afterward

followed. Then the question remains, and it is the final and decisive one, is this so gross a disparity of value as can be accounted for only on the ground of imposition upon mental weakness, so as to be, as the phrase goes, " demonstrative " of incapacity and fraud ? I conclude it is not, but rather that the case must be treated as one of the unfortunate fruits of the speculation in real estate prevalent in this State for some years, and which culminated at about the time of this sale. All have seen, and not a few have felt, its effects. The ordinary and reliable valuations of real estate resting upon sober calculations as to productiveness and income, gave place to fanciful and false estimates based upon exaggerated prospects of advanced prices destined never to be realized ; and these again, by a natural law, are succeeded by depression, and a decline of prices quite below the real value. Our own people largely fell under this influence, and immigrants from other States much more so. Now, there are in every community—we may see such any day—persons inexperienced, ill judging, over-sanguine and visionary, who, in these periods of inflation, fall into rash and improvident bargains. Such cases appeal strongly to our personal sympathies, but in the absence of fraud the law cannot relieve against these follies. To do so would largely unsettle the business of society.

Decree affirmed by the Court of Errors and Appeals at the June Term, 1870. See 4 *Houston's Del. Rep.*, 121.